**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| DAVID P. HAYES, TRUSTEE FOR THE PAUL B. HAYES FAMILY TRUST, DATED APRIL 30, 2010,<br><br>      Plaintiff,<br><br>v.<br><br>CHAPARRAL ENERGY, LLC, and UNITED STATES OF AMERICA; DEPARTMENT OF INTERIOR; BUREAU OF INDIAN AFFAIRS,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 14-CV-495-GKF-PJC<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AMENDED OPINION AND ORDER**

The National Environmental Policy Act ("NEPA") is a process-oriented statute, requiring federal agencies to consider the environmental impacts of their actions. This case involves a dispute over the government's obligations under NEPA with regard to its approval of an oil and gas lease and two (2) drilling permits in Osage County, Oklahoma.

In 2013, Chaparral Energy, LLC ("Chaparral") entered into an oil and gas lease with the Osage Nation for a portion of the Osage mineral estate underlying plaintiff David P. Hayes's property. Shortly thereafter, the government approved the lease as well as Chaparral's applications for permits to drill on Hayes's property. In turn, Hayes brought this action against defendants the United States of America, the Department of Interior (DOI), the Bureau of Indian Affairs ("BIA") (collectively, "the government"), and Chaparral, alleging that the government's approval of the lease and drilling permits failed to comply with NEPA. In response, the government submits that its approval of lease was exempt from NEPA's procedural requirements

and that it had already satisfied those requirements with regard to its approval of the drilling permits.

For the reasons set forth in this Opinion and Order, the court holds that the government failed to comply with NEPA prior to its approval of Chaparral's lease and drilling permits. The court, therefore, declares these documents void.

## I.   BACKGROUND

### A.  *Statutory Framework*

"In 1872, Congress established a reservation for the Osage Nation in present day Oklahoma." *Osage Nation v. Irby*, 597 F.3d 1117, 1120 (10th Cir. 2010) (citing Act of June 5, 1872, ch. 310, 17 Stat. 228). In 1904 and 1905, large quantities of oil and gas were discovered on the reservation. *See* Cohen's Handbook of Federal Indian Law § 4.07[1][d][ii], at 311 (Neal Jessup et al., eds., 2005). To manage the Osages' newfound wealth, Congress enacted the Osage Allotment Act which placed the mineral estate underlying Osage lands in trust and directed the Secretary of the Interior to collect and distribute royalty income to tribal members on a quarterly, pro rata basis. *See* Act of June 28, 1906, Pub. L. No. 59–321, § 4, 34 Stat. 539 ("1906 Act"). The government's trusteeship over the Osage mineral estate was originally set to last twenty-five years, *see* 1906 Act §§ 3, 4, but has since been extended "in perpetuity," *see* Pub. L. No. 95-496, § 2(a), 92 Stat. 1660 (1978).

Under the Act, the Osage Nation may lease portions of the mineral estate for exploration and development "with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe." 1906 Act § 3. The Secretary has delegated this authority to the Superintendent of the Osage Agency. *See* 25 C.F.R §§ 226.4, 226.5(b). Pursuant to departmental regulations, "[n]o operations are permitted upon any tract of land until a lease

covering such tract is approved by the Superintendent." *Id.* § 226.34(a). Further, to commence drilling, a lessee must obtain additional approval from the Superintendent, in the form of a permit to drill. *See id.* § 226.34(b); [*see also* Dkt. #77-5, pp. 40-41].

The Superintendent's approval of leases and drilling permits on Indian lands constitutes federal action subject to NEPA. *See Davis v. Morton*, 469 F.2d 593, 596-97 (10th Cir. 1972); *see also Manygoats v. Kleppe*, 558 F.2d 556, 557 (10th Cir. 1977). NEPA "requires federal agencies … to analyze environmental consequences before initiating actions that potentially affect the environment." *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 735-36 (10th Cir. 2006). Unlike other environmental statutes, however, NEPA does not mandate any particular substantive outcome. *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1166 (10th Cir. 2012). Rather, the Act merely "imposes procedural, information-gathering requirements on an agency," *id.*, so as "to ensure that the agency will only reach a decision on a proposed action after carefully considering [its] environmental impacts," *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 717 (10th Cir. 2010).

NEPA achieves this end by requiring federal agencies to prepare an environmental impact statement ("EIS") before taking any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(ii). "An EIS is a detailed document that identifies the potential impacts a proposal may have on the environment." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022 (10th Cir. 2002). If an agency is uncertain whether an EIS is required, it may elect to prepare a less detailed environmental assessment ("EA"). *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010). "An EA allows the agency to consider environmental concerns, while reserving agency resources to prepare full EIS's for appropriate cases." *Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric.*,

817 F.2d 609, 621 (10th Cir. 1987) (internal quotation marks omitted), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992). "If after preparing [an] EA, the agency concludes that a proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact (FONSI) and need not prepare a full EIS." *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1248 n.3 (10th Cir. 2010) (internal quotation marks omitted). Finally, "[i]n certain narrow instances,…an agency is not required to prepare either an [EA] or an [EIS]. This occurs when the proposed action falls within a categorical exclusion, *i.e.,* those actions predetermined [by the agency] not to 'individually or cumulatively have a significant effect on the human environment.'" *Utah Envtl. Cong.*, 443 F.3d at 736 (quoting 40 C.F.R. § 1508.4).

"The Council on Environmental Quality (CEQ) is tasked with interpreting NEPA and establishing regulations governing agencies' responsibilities under the statute." *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1063 (10th Cir. 2015) (McHugh J., concurring); *accord Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 757 (2004). CEQ regulations require federal agencies to adopt further regulations or procedures identifying specific actions which either normally require an EIS or are categorically excluded. *See* 40 C.F.R. § 1501.4(a). If a proposed action does not fall within either category, the agency then *must* prepare an EA unless it elects to prepare an EIS. *See id.* § 1501.4(b).

### B. *1979 Environmental Assessment*

In 1978, this court entered an agreed judgment, ordering the Secretary of the Interior and the Superintendent of the Osage Agency to prepare an EA

> of the effect on the environment of oil and gas operations under oil mining leases, gas mining leases, oil and gas mining leases, drilling permits, authorizations to use water and other such documents approved or used by the Secretary relating to oil and gas operations on the lands in Osage County, Oklahoma….

Judgment and Order at 2, *Bell v. Andrus*, No. 77-C-159-C (N.D. Okla. May 4, 1978), *available at* [Dkt. #63-1, p. 11].  In 1979, the agency issued an EA "describe[ing] and evalut[ing] all aspects of the oil and gas leasing program in Osage County" under the BIA.  [Dkt. #77-2, p.11]. The EA provided, among other things, a detailed explanation of the leasing program, a description of the County's existing and likely future environmental conditions, and an evaluation of the actual or potential environmental impacts of the leasing program.  [*See id.*]

The assessment also described drilling techniques and practices within the County.  It noted that the typical well then drilled in the County was between 2,000 and 2,500 feet deep, used a 4.5 to 5.5 inch casing, and involved a drilling site occupying approximately half an acre. [*Id.* at 20; Dkt. #77-3, p. 46].  The assessment also briefly discussed the then-recent development of certain secondary production techniques, commonly referred to as "hydraulic fracturing" or "fracking":

> During the early stages of the production in the County, and extending through World War II, wells were operated by natural flow or pumping for as long as they produced enough to make a profit.  When production declined to an uneconomic level a well was abandoned.  As general production decreased through the area, secondary production techniques came into use.  These methods stimulate recovery of oil by using some of the wells to re-inject fluids into the reservoir formations in order to move or displace oil toward other wells.  The brine which is unavoidably produced with oil is frequently used as the re-injected fluid.  Acid treatment or mechanical fracturing of the rock around wells also can be used to restore or maintain production by increasing the permeability so that oil can flow more easily into the well.
> At present, two groups in the county (Phillips Petroleum Company, and Kewanee Petroleum—now owned by Gulf Oil) are experimenting with chemical treatment of the re-injected fluid in order to enhance its ability to mobilize remaining oil within the reservoir formation and to move oil more effectively to a producing well.  These tertiary recovery techniques are expensive and are only in the experimental stage in several parts of the country[.]  If oil prices remain high or increase further, they may become economically feasible methods for oil recovery.

[Dkt. #77-2, p. 20].

The EA ultimately concluded that the leasing program would not have a significant impact on the human environment.  In arriving at this conclusion, the assessment discussed the physical, socioeconomic, cultural, and ecological impacts of drilling in the County, including their projected future impacts.  Notably, all such projections were limited to the year 2000.  Based on EA's findings, the agency issued a FONSI.  [*See id.* at 2-3].

### C.  *Chaparral Lease and Drilling Permit*

In January 2013, Chaparral entered into an oil and gas lease with the Osage Nation for a 160 acre parcel of the Osage mineral estate underlying Hayes's property.  Shortly thereafter, the BIA approved the lease.  In doing so, the BIA determined that its approval fell within a categorical exception for "[a]pproval of mineral lease adjustments and transfers, including assignments and subleases."  [Dkt. #77-4, p. 65]; *see also* 516 DM 10.5(G)(3).

In April 2014, Chaparral submitted an application for a drilling permit to the BIA.  The agency approved the application later that month.  In May 2014, the company submitted an amended drilling permit application, which moved the proposed well site 100 feet to the west.  The agency again approved the application.  In issuing the permits, the BIA did not prepare a new NEPA document nor did it supplement, tier to, incorporate, or otherwise explicitly adopt the analysis of the 1979 EA.

In August 2014, Hayes brought this action pursuant the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*., seeking a declaration that the government's approval of the Chaparral lease and drilling permits failed to comply with NEPA.

## II.   DISCUSSION

Because NEPA "does not provide a private right of action …, this court reviews an agency's approval of a project, including the agency's compliance with NEPA, under the APA." *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 690 (10th Cir. 2010).  In doing so, the court will not "set aside [the] agency decision unless it fails to meet statutory, procedural or constitutional requirements, or unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1260 (10th Cir. 2001).  Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [its decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1184 (10th Cir. 2014) (internal quotation marks omitted).

Here, Hayes challenges the agency's approval of the Chaparral lease and drilling permits for failure to comply with NEPA.  In response, the agency submits that its approval of the lease fell within a categorical exclusion and that its approval of the drilling permits was covered by the 1979 EA and FONSI.  The court addresses these issues in turn.

### A. *Approval of Oil and Gas Lease*

The court starts with the BIA's approval of the Chaparral lease.  "Once an agency establishes categorical exclusions, its decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision was arbitrary and capricious."  *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1023 (collecting cases).  In undertaking such review, the court must accord substantial deference to the agency's interpretation of its own categorical exclusions, *see id.*, and "may reject [that] interpretation only

when it is unreasonable, plainly erroneous, or inconsistent with the [exclusion's] plain meaning." *Utah Envtl. Cong.*, 443 F.3d at 739 (internal quotation marks omitted); *accord Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999).

Pursuant to CEQ regulations, the DOI has designated the BIA's "[a]pproval of mineral lease adjustments and transfers, including assignments and subleases" as a categorical exclusion. 516 DM 10.5(G)(3). As previously mentioned, the BIA determined that its approval of the Chaparral lease fell within this exclusion. In doing so, the agency interpreted the term "lease transfer" as including the initial transfer of a leasehold from a lessor to a lessee. Hayes challenges this interpretation, asserting that the cited exclusion applies only to the adjustment or transfer of *existing* leases, not the execution of new leases. In response, the agency asserts that its interpretation of the exclusion is reasonable and thus is entitled to controlling weight.

In assessing these positions, the court begins, as it must, with the text of the categorical exclusion. *See Rocky Mountain Radar, Inc. v. F.C.C.*, 158 F.3d 1118, 1124 (10th Cir. 1998). As relevant here, the exclusion covers the "[a]pproval of mineral lease…transfers." 516 DM 10.5(G)(3). In the court's view, the plain meaning of this language precludes the agency's interpretation. As a definitional matter, the term "lease," itself, refers to the initial transfer of a leasehold from a lessor to a lessee. *See* Merriam-Webster Online, http://www.merriam-webster.com/dictionary/lease; *Lease*, Black's Law Dictionary (8th ed. 2004). Thus, the "transfer" of a lease necessarily denotes the transfer of rights under an existing lease from a lessor or lessee to some third party. The BIA's interpretation of this language renders the word "transfer" virtually meaningless and thus is incompatible with the plain wording of the exclusion.

The court's understanding of the relevant language is confirmed by its context. As an initial matter, the exclusion does not use the term "lease transfers" in isolation, but rather refers

to "lease adjustments and transfers." Because a lease must exist before it can be adjusted, the exclusion's grouping of "adjustments and transfers" plainly suggests that the exclusion was intended to apply to actions taken on an existing lease.

Second, the examples of a "lease transfer" provided in the exclusion—assignments and subleases—both refer to transfers of an existing lease. Although this listing is certainly not exhaustive, the fact that both examples share this basic characteristic further indicates that the exclusion was not meant to apply to the creation of a new lease. *See Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042 (2012) ("[T]he commonsense canon of *noscitur a sociis*…counsels that a word is given more precise content by the neighboring words with which it is associated." (internal quotation marks omitted)).[1]

Finally, and most importantly, the agency's interpretation of the term "lease transfer" requires reading different language in two of the agency's categorical exclusions as having the same meaning. *Cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (noting that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended" (internal quotation marks omitted)). Specifically, the agency's Departmental Manual includes a categorical exclusion for "[a]pproval[]…of *conveyances and other transfers of interests in land* where no change in the land use is planned." 516 DM 10.5(I). If the agency truly meant for the term "lease transfers" to

---

[1] *See also United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 573 F.3d 997, 1001 (10th Cir. 2009) ("[T]he principle of statutory interpretation called *noscitur a sociis*…allows a court to interpret general terms of statute by association with more specific words, regardless of the order of the words in the statute."); *In re Piazza*, 719 F.3d 1253, 1263 n.4 (11th Cir. 2013) (noting that the canon of *noscitur a sociis* applies "when general language, such as 'including,' *precedes* specific examples" (emphasis in original)); 2A Norman J. Singer et al., Sutherland Statutory Construction § 47:16 (7th ed. 2007) ("[W]hen two or more words are grouped together, and ordinarily have a similar meaning, but are not equally comprehensive, a general word is limited and qualified by a special word.").

include the initial transfer of a leasehold interest from lessor to lessee, the language of this latter exclusion clearly indicates that it knew how to do so.  The agency's use of different language in parallel exclusions strongly suggests that different meanings were intended.  *See Weight Loss Healthcare Centers of Am., Inc. v. Office of Pers. Mgmt.*, 655 F.3d 1202, 1210 (10th Cir. 2011) ("When the drafters so clearly knew how to express one meaning, their failure to do so implies that the meaning was not intended."); *accord Atlas Tel. Co. v. Oklahoma Corp. Comm'n*, 400 F.3d 1256, 1265 (10th Cir. 2005) ("When … an agency includes a specific term … in one provision of a regulation, but excludes it in another, we will not presume that such term … applies to provisions from which it is omitted.").

In sum, the BIA's determination that its approval of the Chaparral lease fell within a categorical exclusion was premised on a plainly erroneous legal interpretation and, thus, was arbitrary and capricious.  The court, therefore, declares the lease void ab initio.  *Sangre de Cristo Dev. Co. v. United States*, 932 F.2d 891, 894-95 (10th Cir. 1991) (holding that an agency's failure to comply with NEPA before approving a lease renders the agency's approval of the lease invalid).[2]

## B. *Approval of Drilling Permits*

The court next considers the BIA's approval of the drilling permits.  As a reminder, the BIA submits that such action was covered by the 1979 EA and FONSI.  Hayes challenges this

---

[2]  The government submits that the appropriate remedy here is to remand the case to the BIA without invalidating the lease.  The court disagrees.  The Tenth Circuit's decision in *Sangre de Cristo Development Co.*, 932 F.2d at 894, clearly holds that an agency's failure to comply with NEPA renders the agency action at issue invalid.  Thus, the BIA's approval of the Chaparral lease was invalid.  Because the court reads 25 C.F.R. § 226.34(a) and § 3 of the 1906 Act "as requiring…valid approval from the [government] in order for [a] lease contract to have legal effect, the … lease contract between [Chaparral] and the [Osage Nation] vested no property interest in [Chaparral]." *Id.* at 895.

position several grounds.  His contentions, however, generally can be sorted into two groups.  First, he contends that the 1979 EA was a broad, programmatic assessment of the oil and gas leasing program in Osage County and thus, without more, is too general to allow for the issuance of site-specific drilling permits.  Second, he submits that the analysis contained in the 1979 EA is outdated and, consequently, that the BIA's reliance on the assessment was arbitrary and capricious.[3]  The court considers these issues in turn.

1. Need for a Site-Specific Analysis

The court first considers Hayes's contention that the 1979 EA is too general to support the site-specific agency action at issue here.  As previously mentioned, federal agencies are required to prepare an EA for any proposed action unless (1) the agency has elected or is otherwise required to prepare an EIS or (2) the action is subject to a categorical exclusion.  *See* 40 C.F.R. §§ 1501.3, 1501.4(a)-(b).  The term "action" encompasses a broad range of agency conduct, including the adoption of official policies, plans, or programs as well as well as the approval of specific projects.  *See id.* § 1508.18(b).  Both forms of action require compliance with NEPA.  *See id.*  Thus, if an agency adopts an official plan or program and, in furtherance thereof, later approves a specific project, the agency ordinarily must prepare a separate EA or EIS for both actions.  *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 716-19 (10th Cir. 2009).

In such cases, agencies are encouraged to "use existing NEPA analyses for assessing the impacts of a proposed action and any alternatives."  43 C.F.R. § 46.120(a).  This can be done "by

---

[3]  Hayes also contends that the 1979 EA and FONSI lacked adequate evidentiary support and failed to comply with NEPA's public involvement requirements.  [*See* Dkt. #79, Plaintiff's Brief, pp. 18-20].  Given the court's rulings on plaintiff's other contentions, it need not resolve these issues here.

supplementing, tiering to, incorporating by reference, or adopting previous NEPA environmental analyses." *Id.* at § 46.120(d); *see also id.* § 46.135 (incorporation by reference); *id.* § 46.140 (tiering). "Tiering" refers to a procedure by which an agency is allowed to incorporate statements from an existing, broader EIS to provide the analysis for a subsequent, narrower NEPA document. *See* 40 C.F.R. §§ 1502.20, 1508.28. "Tiering is appropriate when," among other settings, "the sequence of statements or analyses is … [f]rom a program, plan, or policy [EIS] … to a site-specific statement or analysis." *Id.* § 1508.28. The DOI's supplemental NEPA regulations further permit the agency, and its constituent bureaus (including the BIA), to use an "existing environmental analysis…in its entirety if the [agency or bureau] determines, with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives." 43 C.F.R. § 46.120(c); *accord id.* § 46.300 ("A bureau must ensure that an [EA] is prepared for all proposed Federal actions, except those … [t]hat are covered sufficiently by an earlier environmental document as determined and documented by the Responsible Official[.]").

Here, Hayes's contends that the 1979 EA is a broad, programmatic document and thus, without more, is too general to allow for the issuance of site-specific drilling permits. In response, the government argues that the 1979 EA addressed all current and anticipated drilling in Osage County and thus automatically covers the BIA's approval of the Chaparral drilling permits. Alternatively, the government submits that any violation on its part was trivial and thus harmless.

The government's position lacks merit. As an initial matter, the court notes that the BIA's approval of a drilling permit is an agency action requiring, at a minimum, the preparation of an EA. *See* 40 C.F.R. § 1501.4(a)-(b); 516 DM 10.4, 10.5; *see also* 43 C.F.R. § 46.300; *id.*

§ 46.30 (defining "[p]roposed action" as including a federal agency's issuance of a permit). The 1979 EA is, as Hayes notes, a broad, programmatic document meant to "describe and evaluate all aspects of the oil and gas leasing program in Osage County as it is supervised under existing regulations by the [BIA]." [Dkt. #77-2, 1979 EA, p. 11]. The assessment does *not* specifically address the environmental impact of the BIA's approval of the Chaparral drilling permits. To the extent the BIA believed that such action was "sufficiently covered by" the 1979 EA so as to obviate the need for a new EA, applicable DOI regulations require the agency to make that determination explicitly, "with appropriate supporting documentation." 43 C.F.R. §§ 46.120(c), 46.300. In particular, "[t]he supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.* § 46.120(c). Here, the BIA did not follow these procedures, nor did it make any effort to explicitly incorporate, tier to, or adopt the analysis contained in the 1979 EA. The agency, thus, has failed to comply with NEPA.

The government's arguments to the contrary are unpersuasive. In its view, a programmatic EA automatically covers all site-specific agency action subsequently taken in furtherance of the program at issue. In support of this position, the government points to the Tenth Circuit's statement in *Wyoming v. United States Department of Agriculture*, 661 F.3d 1209 (10th Cir. 2011), that neither NEPA nor the CEQ regulations "requires an agency to include a site-specific analysis for every particular area affected by [a] proposed action." *Id*. at 1255.

The government's reliance on *Wyoming* is misplaced. That case involved a NEPA challenge to the Forest Service's adoption of a nationwide rule—known as the "roadless rule"— prohibiting road construction and certain other activities on lands within the National Forest System designated as "inventoried roadless areas." *Id.* at 1222-25. The State of Wyoming

challenged the action, asserting that the agency's EIS for the proposed rule violated NEPA by failing to include a site-specific analysis of every area affected by the rule. *Id.* at 1254. The district court rejected this argument, and the Tenth Circuit affirmed, holding that NEPA does not require "that agencies prepare a site-specific analysis for every specific location affected by a *broad* administrative action." *Id.* at 1255 (emphasis added). Notably, the court did not hold, as the government now contends, that a site-specific analysis is *never* required under NEPA or that somehow a programmatic EA automatically covers all site-specific agency action subsequently taken in furtherance of the relevant program. *See id.* at 1255-56. Rather, *Wyoming* merely holds that *broad* agency action (such as the adoption of new programs or regulations) does not require site-specific environmental analysis. *Id.*

*Wyoming*'s holding is irrelevant to the site-specific agency action at issue here. Unlike *Wyoming*, which involved one broad agency action, this case involves a broad action followed by a narrower, related action. In particular, it involves the BIA's adoption of an oil and gas leasing program in Osage County—the broad action—followed by its approval of the Chaparral drilling permits—the narrower action. As applied here, *Wyoming* merely holds that the BIA's EA for the oil and gas leasing program (i.e., the 1979 EA) need not include a site-specific analysis of every area affected by the program. The decision does not in any way indicate that the 1979 EA automatically covers all site-specific drilling permits issued as part of the broader leasing program—a holding which would plainly disregard applicable regulations and circuit precedent.[4] *See supra* pp. 11-13 (discussing relevant regulations); *see also New Mexico*, 565 F.3d at 716-19.

---

[4] The government further submits that requiring a new EA for every new drilling permit would render the BIA's permitting process "intractable." [Dkt. #81, p. 19]. This contention overlooks important regulatory provisions allowing the agency to streamline the NEPA process. As previously discussed, applicable DOI regulations permit the agency to "use existing NEPA

- 14 -

As an alternative position, the government submits that any NEPA violation on its part was trivial and thus harmless error. Although neither NEPA nor the APA requires reversal for trivial errors, *see Hillsdale Envtl. Loss Prevention, Inc*, 702 F.3d at 1165, the error here was by no means harmless. The harm that NEPA seeks to avoid is environmentally uninformed decision-making. *Cf. Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002) ("An injury under the NEPA results not from the agency's decision, but rather from the agency's uninformed decisionmaking." (internal quotation marks omitted)). It does so by requiring agencies to gather and document information concerning the environmental impacts of their actions. *See Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004). The BIA has not followed these steps here. Although it now contends that the analysis in the 1979 EA adequately covers its approval of the Chaparral drilling permits, the agency has not provided any supporting documentation to that effect.[5] Under such circumstances, the court cannot treat the violation at issue as harmless.

In sum, the BIA's approval of the Chaparral drilling permits required, at a minimum, that the agency either (1) prepare a new EA or (2) determine, with appropriate supporting

---

analyses for assessing the impacts of a proposed action and any alternatives." 43 C.F.R. § 46.120(a). Although such reuse is not without its own procedural hurdles, *see* § 46.120(c), the procedures at issue are by no means "intractable." Further, if the BIA needs a faster process for approving drilling permits and, as the agency contends, such action will not have a significant impact on the environment, CEQ regulations dictate that proper course of action is for the BIA to issue a categorical exclusion for the agency action at issue. *See* 40 C.F.R. §§ 1501.4(a)(2), 1508.4. The BIA's current course of action—relying on a broad, programmatic EA to support site-specific agency action—seeks to obtain the benefits of a categorical exclusion without going through the notice and comment procedures necessary to promulgate a categorical exclusion. *See id.* §§ 1507.3, 1508.4.

[5] *See* 43 C.F.R. § 46.120(c) (requiring an agency wishing to use an existing NEPA document to "determine[], *with appropriate supporting documentation*," that the existing document "adequately assesses the environmental effects of the proposed action" (emphasis added)); *accord id.* § 46.300 (stating the same requirement for using an existing EA).

documentation, that the 1979 EA adequately assessed the environmental effects of the proposed action. The BIA did not comply with either procedure. Its failure to do so constitutes a material violation of NEPA.

2. Whether the 1979 EA is Outdated

Hayes next contends that the analysis contained in the 1979 EA is outdated and thus that the BIA's reliance on the assessment was arbitrary and capricious. Under CEQ regulations, an agency must supplement an EIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). This same standard applies to the supplementation of EAs. *See S. Utah Wilderness All. v. Norton*, 301 F.3d 1217, 1238 n.19 (10th Cir. 2002) ("The standard for preparing a supplemental EA is the same as for preparing [a supplemental EIS]."), *rev'd on other grounds*, 542 U.S. 55 (2004); *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218 & n.3 (10th Cir. 1997).[6] CEQ guidance indicates that, "[a]s a rule of thumb," a programmatic NEPA document "that [is] more than 5 years old should be carefully reexamined to determine" whether supplementation is necessary. *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,036 (Mar. 23, 1981).[7]

Reviewing an agency's decision not to prepare a supplemental EA or EIS involves a two-step inquiry. First, the court must "look to see if the agency took a 'hard look' at the new information to determine whether supplemental NEPA analysis is necessary." *S. Utah*

---

[6] *See also* Bureau of Indian Affairs, *Indian Affairs National Environmental Policy Act (NEPA) Guidebook* 15 (2012), http://www.bia.gov/cs/groups/xraca/documents/text/idc009157.pdf (noting that the BIA applies CEQ regulations concerning the supplementation of EISs to EAs).

[7] The court "consider[s] this document 'persuasive authority offering interpretive guidance' regarding the meaning of NEPA and the implementing regulations." *New Mexico*, 565 F.3d at 721 n.25 (quoting *Davis*, 302 F.3d at 1125 n.17).

*Wilderness All.*, 301 F.3d at 1238 (internal quotation marks omitted) (alterations in original omitted), *rev'd on other grounds*, 542 U.S. 55, 73 (2004) (noting that NEPA "require[s] an agency to take a 'hard look' at new information to assess whether supplementation might be necessary"). "Second, [if the] court determines that [the] agency took the requisite 'hard look,' it [then] reviews [the] agency's decision not to issue … a supplemental EA [or EIS] under the APA's arbitrary and capricious standard." *Id.* (citing *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989)); *see also Nat. Res. Def. Council, Inc. v. F.A.A.*, 564 F.3d 549, 561 (2d Cir. 2009) (outlining the same two-step analysis); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996) (same).

Hayes submits that the 1979 EA requires supplementation. In particular, he asserts that since 1979 there have been significant legal and technological changes relevant to the environmental impacts of drilling in Osage County. Most notably, he points to the growth and development of hydraulic fracturing. He presents evidence that, unlike 1979, today many well completions in Osage County involve hydraulic fracturing and that such operations employ far larger quantities of fluid driven by significantly more hydraulic horsepower than was the case in 1979. [*See* Dkt. #79-1, Affidavit of Dr. J. Berton Fisher, p. 3].[8] Given these changes, and others, Hayes contends that the BIA's reliance on the 1979 EA to support its approval of the Chaparral drilling permits was arbitrary and capricious.

---

[8] The court may consider extra-record evidence "where the agency ignored relevant factors it should have considered or considered factors left out of the formal record." *Lee*, 354 F.3d at 1242. Hayes offers Dr. Fisher's affidavit to identify new circumstances and information that, he contends, the BIA should have considered. *See* 40 C.F.R. § 1502.9(c)(1)(ii). The court concludes that consideration of the proffered evidence for this limited purpose is permissible. [*See* Dkt. #92, pp. 3-4].

In response, the government submits that the 1979 EA adequately evaluates the potential environmental impacts of hydraulic fracturing and that its determination that the 1979 EA does not require supplementation was not plainly erroneous.

The court agrees with Hayes. As an initial matter, neither the administrative record nor the parties' briefs contains *any* indication that the government actually considered whether the 1979 EA requires supplementation. Although the government states that it made this determination "prior to approving the [Chaparral] drilling permit[s]," [Dkt. #81, p. 24], there is *nothing* in the record to support that assertion. Moreover, even if the agency had made this determination, neither the record nor the government's brief contains any explanation for such a decision. Under these circumstances, the court cannot say that the government has taken the requisite "'hard look' at new information to assess whether supplementation might be necessary." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 73 (2004); *see also Marsh*, 490 U.S. at 378 ("[I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency[]…without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.").

In any event, even if the BIA had consciously determined that supplementation was unnecessary, the court concludes that determination was arbitrary and capricious. The 1979 EA does not contain any discussion of the environmental impacts of hydraulic fracturing. Rather, the assessment merely notes that such technology exists and that it is "expensive and [is] only in [its] experimental stage[s]." [Dkt. #77-2, p. 20]. The EA concludes its discussion of the issue by noting that "[i]f oil prices remain high or increase further, [such drilling techniques] may become [an] economically feasible method[] for oil recovery." [*Id.*] Today, numerous wells drilled and

completed in Osage County involve hydraulic fracturing, and the systems, technology, and chemical completion fluids used in such operations have changed dramatically. [*See* Dkt. #79-1, Affidavit of Dr. J. Berton Fisher, p. 3]. The government cannot reasonably contend that these changes are insignificant or that they are somehow irrelevant to the environmental impacts of drilling operations in Osage County. *Cf.* 40 C.F.R. § 1502.9(c)(1)(ii) (requiring supplementation if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"). The court, therefore, concludes that the government's reliance on the 1979 EA, without supplementation, was arbitrary and capricious.

In sum, the BIA's approval of the Chaparral drilling permits violated NEPA for two independent reasons. First, the agency did not prepare a new EA for the action, nor did it follow the procedures necessary rely on the 1979 EA. Second, even if the agency had followed the proper procedures, its reliance on the 1979 EA, without supplementation, was arbitrary and capricious. For these reasons, the court declares the drilling permits void ab initio. *See Sangre de Cristo Dev. Co.*, 932 F.2d at 894-95; *see also supra* note 2.

## Conclusion

For the forgoing reasons, the court finds that the BIA's approval of the Chaparral lease and drilling permits failed to comply with NEPA. The court, therefore, declares the lease and drilling permits void ab initio.

IT IS SO ORDERED this 5th day of January, 2016.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT